## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY )
OF THE UNITED STATES )
2100 L Street, NW )
Washington, DC 20037, )
                                    )       No. _____

WILD FISH CONSERVANCY )
P.O. Box 402 )
15629 Main Street, NE )
Duvall, Washington 98019 )
                                    )      **Complaint for Declaratory and**

BETHANIE O'DRISCOLL, )      **Injunctive Relief**
                                    )

ANDREA KOZIL, )
                                    )

          Plaintiffs, )

        v. )

GARY LOCKE )
Secretary of Commerce )
U.S. Department of Commerce )
14th Street & Constitution Ave., NW )
Washington, DC 20230, )
                                    )

ERIC SCHWAAB, )
Assistant Administrator, NOAA Fisheries )
National Marine Fisheries Service )
1315 East-West Highway )
Silver Spring, MD 20910, )
                                    )

JAMES LECKY, )
Director, Office of Protected Resources )
National Marine Fisheries Service )
1315 East-West Highway )
Silver Spring, MD 20910, )
                                    )

          Defendants. )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Sea lions eat fish. Each year, sea lions eat between 0.4 and 4.2 percent of the

80,000 to 280,000 salmon and steelhead that spawn in the Columbia River. In comparison,

fishermen are authorized to take approximately up to 17 percent of adults, birds take 18 percent

of juveniles, and hydroelectric dams take a massive 59 percent of adults. Despite these impacts,

recent Chinook salmon returns have been among the highest seen in a decade, and the States of

Washington and Oregon have *increased* the amount of take permitted by fishermen over the last

few years, currently allowing fishermen to take up to 12 percent of the total run in 2011, more

than 5 times the 2.5 percent average total consumption by sea lions over the past 3 years.

2.      Despite over a decade of fishery harvests that far exceed predation by sea lions,

the National Marine Fisheries Service ("NMFS") decided in 2008 that sea lions in the Columbia

River must be killed to protect salmon, and authorized state agents to shoot as many as 85 of the

docile and federally protected marine mammals each year for 5 years – a total of 425 animals.

The agency authorized this killing under Section 120 of the Marine Mammal Protection Act

("MMPA"), 16 U.S.C. § 1389, which provides a limited exception to the MMPA's otherwise

strict prohibition on the killing or harassment of any marine mammal, but only for those marine

mammals that "are having a *significant negative impact on the decline or recovery*" of threatened

or endangered salmon and steelhead populations. *Id.* § 1389(b) (emphasis added).

3.      Shortly after NMFS issued the authorization to kill sea lions at the Bonneville

Dam in 2008, Plaintiffs filed a lawsuit challenging this authorization. In November 2010, the

Court of Appeals for the Ninth Circuit vacated NMFS's decision and remanded it to the agency,

because the agency failed to reconcile its factual finding that sea lions are having a "significant

negative impact" on salmonids with the agency's previous factual findings "that fisheries that

2

cause similar or greater mortality among these populations are not having significant negative impacts." *Humane Soc'y of the U.S. v. Locke,* 626 F.3d 1040, 1048 (9th Cir. 2010). The court noted that NMFS's contradictory factual findings regarding equivalent or greater sources of salmonid mortality "raise questions as to whether the agency is fulfilling its statutory mandates impartially and competently." 626 F.3d at 1049.

4.      Undeterred by this ruling, NMFS has scrambled over the last few months to again authorize the killing of up to 85 sea lions per year at the Bonneville Dam in almost exactly the same manner, and for the same reasons in the decision vacated by the Ninth Circuit. The process began again in haste less than two weeks after the Court of Appeals' decision was issued, with the States of Washington and Oregon requesting new Letters of Authorization for the killing of sea lions at the Dam.

5.      On May 12, 2011, NMFS approved the states' requests without requiring new applications from the states under Section 120 of the MMPA, without providing any prior public notice of the decision, without providing opportunity for public comment on the decision, and without convening the Pinniped-Fishery Interaction Task Force, the purpose of which is to advise NMFS on whether to approve Section 120 applications and to make recommendations about how sea lion removal should be undertaken and when it should be terminated.

6.      In addition to concluding that Section 120's procedural requirements were somehow not applicable to its rushed decision, NMFS issued a Supplemental Information Report ("SIR") on a Final Environmental Assessment of the impacts of the sea lion killing authorization. NMFS stated that it was not re-opening the Environmental Assessment, despite the previous Environmental Assessment now being more than 3 years old, and despite new evidence that salmon and steelhead run sizes are growing and not declining, that the rate of sea lion predation

is decreasing, that fisheries have exceeded their allocations in recent years, and that there are sources of salmon and steelhead mortality that are newly recognized by NMFS.

7.     On May 13, 2011, NMFS publicly announced its decision and indicated that the authorization to kill sea lions would be effective immediately. NMFS's own decision documents, published along with this public announcement after the letters of authorization had already been sent to the states, make clear that the agency dispensed with any public notice, comment, or updated environmental review not for any valid legal or factual reason, but because the agency was "facing a significant constraint to issue a revised decision" due to a May 31, 2011 deadline to add individual sea lions to the list of those that can be killed. SIR at 28.

8.     Accordingly, Plaintiffs again challenge NMFS's finding that the sea lions' annual subsistence taking of 0.4 to 4.2 percent of the total salmon and steelhead run is having a *significant negative impact on the decline or recovery*" under the MMPA as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2). Plaintiffs also challenge NMFS's decisions to disregard Section 120's procedural requirements and to forego any supplement to its Final Environmental Assessment issued in 2008.  NMFS's May 2011 decision to eradicate several hundred native animals to improve salmon runs by, under the most optimistic projection, a couple of percentage points *continues* to stand in stark contrast to many past NMFS decisions finding that salmon take far in excess of 4 percent by fishermen, tribes, and other resources users does *not* have a "significant" impact on the species.  Moreover, the May 2011 decision fails to articulate a rational explanation for reconciling this disparity in *factual* findings as required after the prior ruling of the Court of Appeals for the Ninth Circuit.

9.      Plaintiffs request that the Court vacate the agency's procedurally flawed, facially inconsistent and unlawful decision, and enjoin any killing of sea lions at Bonneville Dam until the agency has fully complied with the requirements of the MMPA.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

11.      Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

12.      Plaintiff the Humane Society of the United States ("HSUS") is a non-profit organization headquartered in Washington, D.C. The HSUS is the nation's largest animal protection organization, with over 11 million members and constituents, including over 360,000 members and constituents who reside in Oregon or Washington. The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands and fostering the humane treatment of all animals. In furtherance of these goals and objectives, the HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals, including California sea lions.

13.      The HSUS has been an active participant during NMFS's consideration of the States' requests to lethally remove sea lions at Bonneville Dam. On behalf of itself and its members, the HSUS commented on the Section 120 applications that resulted in NMFS's March 2008 authorization to kill sea lions at the Dam. Further, an HSUS employee served as a federally-appointed member of the Pinniped-Fishery Interaction Task Force convened to assist NMFS in its consideration of those applications. If NMFS had followed the procedural

requirements set forth in Section 120 of the MMPA prior to issuing its May 2011 decision, the HSUS would have again commented on any applications that were submitted.  Further, the same HSUS employee continues to serve as a member of the Pinniped-Fishery Interaction Task Force, which should have been convened in order to make recommendations on any new applications for authorization under Section 120, especially given the new data relied upon by NMFS in making its May 2011 decision.

14.    The HSUS also brings this action on behalf of its members. HSUS members regularly enjoy viewing sea lions both near Bonneville Dam and further down the Columbia River. These members enjoy looking for, sighting, and observing the sea lions, and particularly enjoy observing individual animals that members have learned to recognize based on brands, tags, identifying natural markings, or personalities. These members have an emotional connection to the individual sea lions they have gotten to know, similar to the connection they feel to a family pet. These members plan to continue identifying and returning to observe their favorite individual sea lions at the Bonneville Dam in the future.

15.    Other HSUS members live near Bonneville Dam and regularly enjoy kayaking, hiking, and observing the Columbia River and the sea lions near and just down-river of the Dam. These members plan to continue boating, hiking, and observing the behavior of the sea lions near the Bonneville Dam in the future.

16.    HSUS members' interests in observing, studying, and appreciating these sea lions, particularly the animals that they recognize individually, are injured by NMFS's decision to kill sea lions at Bonneville Dam – likely some of the very animals the members regularly observe and recognize. If the individuals are killed, these members will no longer be able to observe and recognize their favorite individual animals. Even if the individual animals are not killed, the

6

members will be emotionally affected by worrying about the animals' impending or possible deaths. These members' enjoyment in observing sea lions will be diminished, particularly as they look for the individual sea lions they recognize and are concerned that, if the animals are not there, they may have been shot.

17.     In addition, members who frequently boat and hike near the Bonneville Dam are concerned that their recreational enjoyment will be diminished by witnessing the killing, blood, or carcasses of sea lions in or near the water. They are also concerned that closures of portions of the river and adjacent recreational areas during the killing will prevent the members from recreating near the Dam. Also, if the agency is successful in reducing the number of sea lions that frequent the dam, these members' ability to sight and observe sea lions will also be limited.

18.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals that HSUS members recognize, and preserve the recreational and emotional enjoyment that HSUS members receive from seeing the individual animals and recreating free from blood, carcasses, and killing.  Further, a remand specific to the procedural violations raised by Plaintiffs would remedy the procedural rights of the HSUS, its staff, and its members to participate in the Section 120 approval process, and would remedy informational harms stemming from NMFS's failure to publish the states' December 2010 requests for killing sea lions at Bonneville Dam, and particularly the states' justifications for such killing in light of the new data provided in support of NMFS' May 2011 decision.

19.     Plaintiff Wild Fish Conservancy ("WFC") is a non-profit organization dedicated to the recovery and conservation of the Northwest region's wild fish ecosystems, with about 2,400 members. Wild Fish Conservancy's staff of over 20 professional scientists, advocates, and educators work to promote technically and socially responsible habitat, hatchery, and harvest

management to better sustain the region's wild fish heritage. Specifically, WFC promotes scientifically credible wild fish conservation by advocating for risks to be acknowledged and addressed, data responded to appropriately, laws obeyed, and conservation responsibilities distributed objectively and equitably. WFC believes that the best way to achieve fish conservation is through credible and transparent science-based agency decision-making. Wild Fish Conservancy's members use and enjoy rivers and streams throughout the Columbia River watershed for recreational, scientific, and aesthetic purposes, deriving benefits from robust salmon and steelhead populations and healthy aquatic and marine habitats.

20.     Wild Fish Conservancy brings this action to challenge NMFS's decision to allow 85 sea lions a year to be killed at Bonneville Dam. WFC believes the agency's plan is unlawful and does not represent a valid, scientifically-sound decision based on the data and analyses available. WFC believes that salmon recovery will not be achieved unless NMFS adopts a more rigorous approach to circumstances such as those presented by this case that accounts transparently for all sources of mortality and all amounts of mortality that are permitted by NMFS under the numerous permitting processes the agency directly controls. WFC and its members are concerned that, by making this decision, valuable state and federal resources that could be spent on effective fish conservation programs are being wasted on an unlawful and irrational sea lion removal project. WFC and its members are concerned that projects like NMFS's plan to kill sea lions at Bonneville Dam will delay and hamper efforts to address the significant threats facing wild fish in the Columbia River and will hasten the decline of these species.

21.     Vacating the agency's decision to kill sea lions at Bonneville Dam will stop an unlawful and irrational project from proceeding, and save valuable funding that can be used on

beneficial conservation projects that Wild Fish Conservancy advocates for, and that can be used to help stabilize and recover the wild fish populations Wild Fish Conservancy's members enjoy.

22.     Plaintiff Bethanie O'Driscoll resides in St. Helens, Oregon on property that overlooks the Columbia River. In the spring, in addition to viewing sea lions from her house, Ms. O'Driscoll also sees sea lions when she goes out on the Columbia River to kayak and sail several times each week. She also frequently visits Astoria, Oregon, where many sea lions haul out during the spring, to photograph and try to recognize her favorite animals. During the past 14 years she has lived in St. Helens, Ms. O'Driscoll has learned to recognize certain individual sea lions by their brands, markings, or personalities. For example, Ms. O'Driscoll has learned to recognize two sea lions she calls "Smile" and "Solo." Smile often comes up to her kayak, swims around, and follows her on the water. Although Smile does not have a brand, she can recognize him by his markings, the large number of whiskers he has, and by his particular personality. Solo sat in one spot for days, refusing to move, after the Oregon Department of Fish and Wildlife trapped and killed his companion. She has also learned to recognize C552, C555, C404, and other sea lions, each of whom has his own individual personality. C404 has already been added to the list of animals authorized to be killed under the lethal removal program. Ms. O'Driscoll has developed a personal relationship with some of these animals, in the same way people develop a relationship with a family pet. Ms. O'Driscoll intends to continue boating, observing, and photographing sea lions in the future.

23.     Ms. O'Driscoll is a member of the HSUS, and is aware of NMFS's decision to kill up to 85 sea lions per year at the Bonneville Dam. Some of the same sea lions that Ms. O'Driscoll has gotten to know have been documented to visit the Dam. Ms. O'Driscoll will be severely emotionally affected if she learns that any of her favorite sea lions – with whom she

maintains a relationship with like that of a pet – have been killed.  Further, her enjoyment of boating, observing, and photographing sea lions will be greatly diminished if she tries to look for her favorite animals, and if she does not see them, fearing they may have been killed at Bonneville.

24.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals that Ms. O'Driscoll has a relationship with and retain the recreational and emotional enjoyment she receives from observing and recognizing those individuals.

25.     Plaintiff Andrea Kozil resides in Portland, Oregon, and is a frequent observer of sea lions up and down the Columbia River. She frequently visits Astoria and Sauvie Island to watch the animals, and she usually stops to try to observe sea lions on each of her frequent trips up the Gorge near Bonneville Dam. Ms. Kozil particularly enjoys trying to recognize some of her favorite animals when they are hauled out. She usually looks for a particular animal who has unique markings – a double light-brown circle on his head. She also enjoys looking for other individuals she has learned by brand or tags, like C598 and C771, whom she has enjoyed watching interact with one another, C795, C70 and C16.  C795 has already been added to the list of animals authorized to be killed under the lethal removal program. Ms. Kozil plans to continue observing sea lions in the future, just as she has done in the past.

26.     Ms. Kozil is a member of the HSUS, and is aware of NMFS's decision to kill up to 85 sea lions per year at the Bonneville Dam. Ms. Kozil is concerned that some of the animals she has learned to recognize may be killed as part of NMFS's plan, and the special connection she feels with some of the animals will be broken. Her enjoyment in watching the animals will

be been diminished as she tries to look for animals she recognizes and worries she is unable to see them because they have been killed at Bonneville Dam.

27.     Vacating the agency's decision to kill sea lions at Bonneville Dam will preserve both the lives of the individual animals that Ms. Kozil has a relationship with and retain the recreational and emotional enjoyment she receives from observing and recognizing those individuals.

28.     Defendant Gary Locke is the Secretary of Commerce ("Secretary") and has ultimate responsibility for the programs of NMFS. Secretary Locke is sued in his official capacity.

29.     Defendant Eric Schwaab is the Assistant Administrator for NMFS, the agency within the Department of Commerce that has been delegated the responsibility for implementing the MMPA. Mr. Schwaab is sued in his official capacity.

30.     Defendant James Lecky is the Director of the Office of Protected Resources at NMFS. Mr. Lecky signed the Letters of Authorization at issue in this case. Mr. Lecky is sued in his official capacity.

31.     Collectively, Defendants named in Paragraphs 28 through 30 above shall be referred to as "Defendants" or "NMFS" in this Complaint.

## STATUTORY BACKGROUND

### A.     The Marine Mammal Protection Act

32.     The Marine Mammal Protection Act ("MMPA") represents Congress' most expansive explication of the nation's commitment to the "protection and conservation" of sea lions and other marine mammals. 16 U.S.C. § 1361(5). The MMPA's primary purpose is to remedy "man's . . . malign neglect and virtual genocide" of marine mammals, and to promote

"solicitous and decent treatment" of "polar bears, manatees and other [animals that] have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities, all in the interest of profit or recreation." H.R. Rep. No. 92-707, 92nd Cong., 2nd Sess. 1 (1971).

33.    To fulfill this purpose, the MMPA establishes a strict moratorium on the taking and importation of all marine mammals and marine mammal products. 16 U.S.C. § 1371(a). The Act defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13).

34.    In 1994, Congress enacted a limited exemption to the prohibition on taking marine mammals. Section 120 of the MMPA authorizes the Secretary of Commerce, upon the filing of an application by a state, to "permit the intentional taking of individually identifiable pinnipeds" – a grouping of marine mammals that includes sea lions, fur seals, and true seals – if the Secretary determines that the pinnipeds are having a "significant negative impact on the decline or recovery" salmon stocks listed as endangered or threatened. 16 U.S.C. § 1389(b).

35.    Consistent with the MMPA's narrow limitation on the take of marine mammals, Section 120 establishes a specific procedure that must be followed, and sets out a series of determinations the Secretary must make, before permitting the take of pinnipeds.

36.    Upon receiving a Section 120 application from a state, NMFS must determine whether the application contains "sufficient evidence" to warrant convening a Pinniped-Fishery Interaction Task Force. 16 U.S.C. § 1389(c)(1). Specifically, the Secretary must consider whether the application "include[s] a means of *identifying individual pinniped* or pinnipeds, and . . . include[s] a detailed description of the problem interaction and *expected benefits of taking.*" *Id.* § 1389(b)(2) (emphases added).

37.     If warranted, NMFS must publish a Federal Register notice requesting comments on the application. *Id.* § 1389(c)(1). The legislative history of the Section 120 amendments to the MMPA makes clear that Congress considered public comment to be an important and required part of the decisionmaking process. "[T]here are numerous opportunities for public comment and safeguards in this provision to ensure a careful and thoughtful deliberation of the request to lethally remove a nuisance animal."   140 Cong.Rec. S3288, S3300.

38.     NMFS must also convene a Pinniped-Fishery Interaction Task Force. The Task Force is assigned to "recommend to the Secretary whether to approve or deny the proposed intentional lethal taking of the pinniped or pinnipeds," and provide "a description of the specific pinniped individual or individuals, the proposed location, time, and method of taking, criteria for evaluating the success of the action, and the duration of the intentional taking authority." *Id.* § 1389(c)(3). The Task Force must also "suggest nonlethal alternatives." *Id.*

39.     The MMPA provides that the Secretary must decide whether to approve or deny the application only after receipt and consideration of the Task Force's recommendations. The MMPA also provides very specific findings the agency must make before lethal action may be authorized.  First, the Secretary may *only* authorize the lethal taking of "individually identifiable pinnipeds which are having a *significant negative impact* on the decline or recovery of salmonid fishery stocks which . . . have been listed as threatened species or endangered species" under the Endangered Species Act ("ESA"). *Id.* § 1389(b)(1)(A) (emphasis added). Also, the Secretary "shall consider: (1) population trends, feeding habits, the location of the pinniped interaction, how and when the interaction occurs, and how many individual pinnipeds are involved; (2) past efforts to nonlethally deter such pinnipeds, and whether the applicant has demonstrated that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal

steps without success; (3) the extent to which such pinnipeds are causing undue injury or impact to, or imbalance with, other species in the ecosystem, including fish populations; and (4) the extent to which such pinnipeds are exhibiting behavior that presents an ongoing threat to public safety." *Id.* § 1389(d)(1)–(4).

40.     Congress clearly intended that NMFS fully consider all other factors impeding recovery prior to determining whether to approve a request to kill sea lions. Indeed, upon enacting section 120 of the MMPA, Congress explicitly "recognize[d] that a variety of factors may be contributing to the declines of these stocks," and made clear to the agency that "the current levels of protection afforded to seals and sea lions under the Act should not be lifted *without first giving careful consideration to other reasons for the decline*." H.R. REP. NO. 103-439 (1994) (emphasis added).

41.     If, after considering the Task Force's recommendation, NMFS approves the application, lethal take may occur.

42.     The MMPA also strongly emphasizes the humane treatment of marine mammals. Defining "humane," the Act states: "in the context the taking of a marine mammal . . . that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved." 16 U.S.C. § 1362(4); *see also id.* § 1374(b)(2)(B) (in order to issue take permits, Secretary "shall . . . specify . . . the location and manner (which must be determined by the Secretary to be humane) in which they may be taken"); *id.* § 1379(h) (authorizes states, federal agencies, and local governments to take marine mammals for the protection of the mammal or public health "in a humane manner (including euthanasia)").

43.     Congress consistently expressed its intent that the lethal removal of pinnipeds under Section 120 be done in a humane manner. *See* S. Rep. 103-220, at 18 (1994) (the "new

section . . . of the MMPA [will] govern the lethal and *humane* removal of identifiable nuisance pinnipeds") (emphasis added); 140 Cong. Rec. S3288, S3296 (1994) (statement of Senator Kerry) (same).

**B.     The National Environmental Policy Act**

44.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The critical purposes of the statute include "insur[ing] that environmental information is available to public officials and citizens before decisions are made and actions are taken," and "help[ing] public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c). "Public scrutiny [is] essential to implementing NEPA." *Id.*

45.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is known as an Environmental Impact Statement ("EIS").

46.     The EIS must detail, among other things, "the environmental impact of the proposed action" and "alternatives to the proposed action." *Id.* NEPA further requires that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

47.     NEPA's implementing regulations elaborate on these statutory requirements. The regulations provide that agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The regulations further provide that "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." *Id.* § 1502.24.

48.     NEPA requires that when an agency proposes to undertake an "action," the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and its implementing regulations. 40 C.F.R. § 1501.4(a).

49.     If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. *Id.* § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. *Id.*

50.     In the EA, the agency must consider a number of factors to determine whether an action has a "significant" effect on the environment to trigger preparation of an EIS. These factors include: (1) "[i]mpacts that may be both beneficial and adverse," even if the action on the whole is beneficial, (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," (4) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," and (5) "[t]he degree to which the action may adversely affect an endangered or threatened species." *Id.* § 1508.27(b)

51.     NEPA requires agencies to take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. Agencies are required to prepare a supplemental EIS if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). An agency's determination of whether to supplement an EIS or

Environmental Assessment is subject to judicial review under the APA's "arbitrary and capricious" standard.

52.     Neither the NEPA statute nor the Council on Environmental Quality's implementing regulations envision the issuance of Supplemental Information Reports. Agencies are required to supplement an EA or EIS when the statutory and regulatory thresholds are triggered; an SIR is not an appropriate substitute for a supplemental EA or EIS. Similarly, a Supplemental Information Report cannot be used to cure deficiencies in an original EA or EIS.

**C.      The Administrative Procedure Act**

53.     The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

54.     In applying the APA to a final agency action, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

## FACTUAL BACKGROUND

**A.      Listed Salmonids in the Columbia River Basin**

55.     The Columbia River, which marks part of the border between Oregon and Washington State, runs from British Columbia to the Pacific Ocean. Its largest tributary, the Snake River, runs through Idaho until its confluence with the Columbia River near Richland, Washington.

56.     "Salmonids" refer to the family *Salmonidae*, which includes several species of salmon, as well as steelhead trout (also called rainbow trout). Salmonids are anadromous fish, meaning they migrate up rivers from the ocean to breed in fresh water.

57.     Due to numerous threats and declining populations, in 1992, NMFS began listing certain salmonids as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544.

58.     Instead of listing the whole species, NMFS instead listed "distinct population segments" ("DPSs"), or subsets, of salmonid species. 16 U.S.C. §§ 1533(a)(1), 1532(16). NMFS considers a stock of salmon to be a DPS if it "represents an evolutionarily significant unit" of the species. 58 Fed. Reg. 58,612, 58,618 (Nov. 20, 1991); 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

59.     NMFS has listed thirteen evolutionarily significant units ("ESUs") of salmonids in the Columbia River basin as threatened or endangered. Final Environmental Assessment on Reducing the Impact on At-risk Salmon and Steelhead by California Sea Lions in the Area Downstream of Bonneville Dam on the Columbia River (2008) ("Final EA") 3-16. These ESUs are typically distinguished by their run – the seasonal timing when a stock leaves the ocean and migrates upriver to breed.

60.     Five of the thirteen listed Columbia River ESUs are implicated in this case due to the overlap between the timing of their run and the presence of California sea lions at Bonneville Dam. Final EA 3-19; Supplemental Information Report to the 2008 Final EA (2011) ("SIR") 13. These ESUs include all naturally spawned and certain artificially propagated fish of the following runs: Upper Columbia River Spring-run Chinook (endangered), Snake River Spring/Summer-run Chinook (threatened), Snake River Basin Steelhead (threatened), Middle Columbia River Steelhead (threatened), and Lower Columbia River Steelhead (threatened). *Id.*;

70 Fed. Reg. 37,160 (June 28, 2005) (listing rule); 50 C.F.R. § 223.102(a) (listing threatened

salmonid ESUs); 50 C.F.R. § 224.101(a) (listing endangered salmonid ESUs).

61.     Although salmonid populations in the Columbia River have long been in decline

and continue to face a multitude of threats, returns of these salmonid runs have increased every

year since the states' December 2006 applications to kill sea lions at the Bonneville Dam,

increasing by more than 300 percent from 2007 to 2010. SIR at 11. Last year's salmonid passage

at the Dam was the largest since sea lion presence at the Dam was first recorded in 2002.  *Id.*

Moreover, the U.S. Army Corps of Engineers' May 13, 2011 report from the Dam stated: "[t]he

salmonid passage to date is now the 4th highest since 2002 and climbing fast."  Stansell et al.,

Status Report, Pinniped Predation and Deterrent Activities at Bonneville Dam, 2011 at 2 ("Stansell

2011 Report").

62.     Hydropower development has dramatically affected the status of salmonids.

Numerous dams lie along the Columbia River and its tributaries. For example, endangered Upper

Columbia Spring-run Chinook breeding north of the Wenatchee River must navigate over seven

dams. *See* Upper Columbia River Spring Chinook Salmon and Steelhead Recovery Plan (2007)

at 90. NMFS estimates that 4 percent of adult salmon and steelhead can be lost *at each dam*. *Id.*

63.     In addition to direct mortality, dams also indirectly kill salmonids by blocking

access to spawning and rearing habitat and altering riparian habitat, temperature, flood events

and thus nutrient input.

64.     The 2008 Final EA provides estimates for the base mortality resulting from the

Federal Columbia River Power System for each ESU: (1) 9.9 percent of adult Upper Columbia

River Spring-run Chinook taken in dams and 35.4 percent of juveniles, (2) 15.4 percent of adult

Snake River Spring/Summer-run Chinook and 51.5 percent of juveniles, (3) 16.8 percent of adult

Snake River Basin Steelhead and 59.9 percent of juveniles, (4) 7.1 percent of adult Middle

Columbia River Steelhead and 2.3 percent of juveniles, and (5) 7.1 percent of Lower Columbia River Steelhead and 2.3 percent of juveniles. Final EA 3-32. The SIR notes that NMFS issued a new Biological Opinion for the Federal Columbia River Power System in 2008 ("2008 Dam BiOp"), which was supplemented in 2010, but the SIR does not provide any new findings in terms of the number of adult and juvenile salmon and steelhead taken by dams. SIR at 13-14.

65.     As part of its 2007 Federal Columbia River Power System and Upper Snake River Biological Opinion, NMFS specifically acknowledges and authorizes such levels of take – *i.e.*, *upwards of 10 percent of adults and 35 percent of juveniles* – as not jeopardizing the various salmonid ESUs. This finding is reiterated in the 2008 Dam BiOp (finding no jeopardy to lower Columbia basin salmon and steelhead at current levels of take with Reasonable and Prudent Alternatives in place). 2008 Dam BiOp at 4-11.

66.     Fisheries are another major source of salmonid mortality.

67.     Intentional taking of a threatened or endangered salmonid, whether naturally-spawned or hatchery-raised, is prohibited under Section 9 of the ESA. 16 U.S.C § 1538(a)(1)(B). However, NMFS has exempted certain hatchery-spawned fish that are listed as threatened from that prohibition. 50 C.F.R. § 223.203(a). Despite specific limitations on which hatchery-spawned fish may be taken, the incidental take of non-exempt threatened and endangered salmonids still regularly occurs. NMFS estimates that 10 percent of listed fish caught and released during recreational fishing die, and in terms of commercial fishing activities, 1 percent of fish die after being caught in a dip net, 18.5 percent from selective tanglenet, and 30 percent from selective gillnet fisheries. *See* Biological Opinion on Impacts of Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in Years 2005-2007, on Salmon and Steelhead Listed under the

Endangered Species Act, Conference on Lower Columbia Coho, and Magnuson-Stevens Act Essential Fish Habitat Consultation (2005), at 87 ("2005 Fisheries BiOp").

68.     NMFS regulates the number of incidental takes allowed from in-river sport and commercial fishing by tribal and non-tribal entities. NMFS's 2005 Fisheries BiOp described the level of take allowed by the mainstem Columbia fisheries. The harvest rate schedules described therein were subsequently adopted into NMFS's 2008-2017 U.S. v. Oregon Management Agreement for Upriver Chinook, Sockeye, Coho, and White Sturgeon (2008) ("2008 Fisheries BiOp"). SIR at 16. Pursuant to these harvest schedules NMFS currently allows up 17 percent of the natural origin Upper Columbia River Spring-run Chinook and Snake River Spring/Summer-run Chinook salmon runs to be taken, depending on the total run size. *Id.*; Final EA 3-32. According to the Final EA, NMFS also allows up to 6 percent of both the Middle Columbia River and Lower Columbia River Steelhead natural-origin runs to be incidentally taken. Final EA 3-32.

69.     In its Biological Opinions concerning fisheries impacts on listed salmonids, NMFS determined that currently authorized levels of take – *i.e.*, from 5.5 to 17 percent – would not jeopardize the various ESUs. *See* 2005 Fisheries BiOp at 118; 2008 Fisheries BiOp at 42. Further, NMFS also issued a "finding of no significant impact" with respect to these harvest schedules after making the factual finding that the cumulative impacts from the authorization of take by fisheries of up to 17 percent "would be minor if at all measurable." Environmental Assessment on the Biological Opinion and Associated Incidental Take Statement on Treaty Indian and Non-Indian Fisheries in the Columbia River Basin in the Years 2005-2007 (2005) at 69, 79 ("2005 Fisheries Take EA").

70.     For the 2008 season, the same season that NMFS first authorized the killing of sea

lions at Bonneville Dam under Section 120 of the MMPA, the states of Oregon and Washington

*increased* the amount of upriver spring Chinook allowed to be incidentally taken by tribal and

non-tribal fisheries from 9 percent to 12 percent of the runs.  *See* Joint 2008 Staff Report: Stock

Status and Fisheries for Spring Chinook, Summer Chinook, Sockeye, Steelhead, and Other

Species (2008) at 41.  Put another way, the states *increased* the number of salmon that fishermen

could take by the same amount that all sea lions at the Bonneville Dam were responsible for

taking (NMFS estimates that sea lions caught 2.9 percent of the salmonid runs in 2008). *See* SIR

at 11. Even though the states subsequently reduced the allowable harvest rate to 11 percent

during the season, the actual fishery harvest by the end of the season was estimated to total 16

percent. *Id.* at 16. Thus, despite fishery managers' attempts to control fishery harvest, fishermen

took 4 percent more of the run than they were originally allocated.

71.     Similarly, last year the allowable 2010 season harvest rate for upriver spring

Chinook was set at 13 percent by fishery managers. SIR at 16. Despite fishery managers'

implementation of control measures during the season, including protective impact buffers and

catch sharing principles, fishermen actually took 17 percent of the spring Chinook salmon run.

*Id.* Thus, in recent years, fishery harvest has been permitted to increase and has proven to be

difficult to control.

72.     Hatcheries are also harmful to wild-run salmon and steelhead populations. In

addition to consuming and competing with wild-run fish, hatchery fish may transmit hatchery-

borne disease, and interbreeding can affect genetic variability. 2005 Fisheries BiOp at 78. NMFS

has noted that hatcheries are one of the main factors delaying salmonid recovery, explaining that

hatchery fish may "affect diversity and productivity of naturally produced stocks," and also

"ecological effects that reduce the abundance and productivity of populations," including "altered body size and survival of naturally produced fish." *Id.* at 89.

73.     In 2009, a Congressionally-established Scientific Review Group ("HSRG") submitted a report to Congress with recommendations for the reform of harvest and hatchery practices in the Columbia River system. The HSRG found that the current operation of hatcheries required modification to, among other things, minimize adverse ecological interactions between hatchery- and natural-origin fish.  In its full report recommending changes to practices of harvest and hatchery operation, the HSRG found that ". . . the traditional practice of replacing natural populations with hatchery fish to mitigate for habitat loss and mortality due to hydroelectric dams is not consistent with today's conservation principles and scientific knowledge."  Report to Congress on Columbia River Basin Hatchery Reform at 7-8.  These recommendations have not been implemented despite the HSRG's call for prioritizing them in the recovery strategy.

74.     Predation presents another source of salmonid mortality. Other fish, including adult salmonids, northern pikeminnow, walleyes, and smallmouth bass, consume juvenile salmonids. 2007 Upper Columbia Recovery Plan at 94. Predation by birds, such as great blue herons, gulls, and osprey can also impact populations. *Id.* For example, NMFS estimates that avian predators consumed 18 percent of smolts, or juvenile salmonids, reaching the Columbia River estuary in 1998. *Id.* Mammals, including sea lions, raccoons, river otters, mink, black bears, and harbor seals, also consume salmonids. *Id.*

75.     In the May 2011 SIR, NMFS recognizes "new information" indicating that predation by non-indigenous fish on juvenile salmonids "could equal or exceed impacts" from each of the four primary factors impacting salmonid recovery: hydrosystem development,

fisheries harvest, hatchery practices, and habitat alteration. SIR at 12. NMFS notes that this data is the result of "a number of focal studies" on the issue, but states that "further research is needed into region-wide impacts . . . ." *Id.*

**B.    California Sea Lions in the Columbia River Basin**

76.    California sea lions (*Zalophus californianus californianus*) are large marine mammals with a range from southern Mexico to southeast Alaska. Final EA 3-3. Known for their dog-like features, male California sea lions can grow to 1000 pounds and 8 feet long. Females can grow to 6 feet long, but typically only reach 300 pounds.

77.    Breeding for California sea lions typically occurs on or near the Channel Islands, off the coast of southern California. Females are rarely observed north of the California-Oregon border, but males migrate further north after breeding. *Id.* Male sea lions reach the mouth of the Columbia River in early February.

78.    Official counts of California sea lions at Bonneville Dam began in 2002. NMFS estimates that around 30 sea lions were present in 2002; the number jumped to 106 in 2003 and then decreased annually to 71 sea lions in 2007. SIR at 8. Since 2007, the number of California sea lions at the Dam has varied, with over 80 sea lions present in 2008 and 2010 (though these numbers were still lower than the numbers present in 2003 and 2004), but only 54 sea lions present in 2009 (the lowest number since counts began in 2002). *Id.* The sea lions typically arrive at the Dam in mid-February and leave the Columbia River to return to breeding grounds by late May. Final EA 3-7.    However, the mean residency time for individual sea lions observed at the Dam has been declining since 2008, from 20 days in 2008 to 9.3 days in 2010.

79.    California sea lions consume a number of different types of fish in the Columbia River, including salmonids. They also consume other fish species that prey on salmonids.

NMFS's 2008 Final EA indicated that observed salmonid consumption by sea lions at the Bonneville Dam varies, depending on run size, ranging from 0.4 percent of the run in 2002, to 3.4 percent in 2005, down to 2.8 percent in 2006, and up to 4.2 percent in 2007. Final EA 3-13; 1-5. However, the rate of California sea lion predation has decreased every year since NMFS's 2008 authorization to kill sea lions at the Dam.  In 2008, the rate was 2.8 percent of the run, and the rate decreased to 2.1 percent in 2009, and then again to 1.9 percent in 2010. SIR at 11.

80.    Despite the fact that lethal removal of sea lions has not been allowed this season, preliminary reports for 2011 indicate that "total salmonids catch for [California sea lions] is going to be much lower than the last few years." Stansell 2011 Report at 2.

81.    NMFS's 2008 Fisheries BiOp states that the agency believes that the Section 120 lethal removal program can be anticipated to reduce sea lion predation rates to, at best, 3.0 percent for spring Chinook salmon runs. 2008 Fisheries BiOp at 8-16. Yet, in four of the six years preceding authorization of lethal removal activities, sea lion predation rates were below 3.0 percent, and this year, in 2011, when lethal removal activities have been prohibited due to vacatur of NMFS's Section 120 authorization by the Ninth Circuit, the sea lion predation rate is expected to be much lower than the last few years (predation rates during the last three years were all lower than 3.0 percent).  This begs the question of whether there can be any justification for the lethal removal program at all.

**C.    Steller Sea Lions in the Columbia River Basin**

82.    The eastern stock of Steller sea lions (*Eumetopias jubatus*) is listed as threatened under the  Endangered Species Act, 16 U.S.C. § 1531 *et seq*. They are year-round residents of coastal Oregon and Washington; however, after the breeding season, male Steller sea lions are rarely seen along the Oregon coast. They disperse into more northern feeding grounds in

Washington, Canada, and Alaska. They venture at times into the Columbia River, where their distribution overlaps that of California sea lions. Both species have been observed feeding on salmon below Bonneville Dam. Final EA at 3-4 – 3-5.

83.     The number of Steller sea lions observed at the Bonneville Dam has steadily increased, especially in recent years, from 0 in 2002 to 75 in 2010 (the mean number of Steller sea lions during this time was 19). SIR at 8.

84.     As a result of the increase in Steller sea lion presence at the Bonneville Dam, a larger percentage of the overall pinniped predation rate is attributable to Steller sea lions. SIR at 11. In 2010, Steller sea lions accounted for over 16 percent of pinniped predation. *Id.* However, the overall rate of pinniped predation decreased even during the years that Steller sea lion presence has been increasing – in 2008, the overall pinniped predation rate was 3.0 percent of the run, and the rate decreased to 2.4 percent in 2009, and then again to 2.2 percent in 2010. *Id.*

85.     Steller sea lions have been adversely impacted by the Section 120 activities authorized by NMFS.  In May 2008, two Steller sea lions hauled out on floating platform traps died after the gates had been closed preventing their exit.  Initial reports suggested that the sea lions had been shot, but NMFS later concluded that the sea lions died of heat stroke.

**D.     Section 120 and the Ballard Locks Situation**

86.     Congress enacted Section 120 of the MMPA primarily in reaction to a particular instance of pinniped predation of steelhead occurring at Ballard Locks in Seattle, Washington. *See* 140 Cong. Rec. S3288-01, S3299 (1994) (statement of Senator Kerry explaining Section 120 was added to "address a decade-long problem in Washington State" and describing the Ballard Locks situation in detail); S. Rep. 103-220 (1994) (Section 120 "was developed in response to

predation by nuisance pinnipeds of fish runs at Ballard Locks and Columbia River in Washington State").

87.     The Ballard Locks control the water level in the Lake Washington shipping canal. In 1993-1994, the season prior to the MMPA's enactment, the winter-run steelhead run at Ballard Locks had diminished from its historic run of 2500 fish per year to only 70 fish. *See* Environmental Assessment on Protecting Wild-Run Steelhead from Predation by California Sea Lions in the Lake Washington Ship Canal, January 1995 ("Ballard EA") at 4. Marking the lowest run on record, NMFS had instituted a variety of measures, including first limiting and then completely closing both sport and tribal fisheries, improving fish passage, and altering flow to improve the abundance of steelhead populations.

88.     In previous seasons, sea lions had consumed between 42 and 65 percent of the steelhead run, and NMFS determined that "sea lion predation, *by itself*, ha[d] been documented to have prevented achievement" of steelhead spawning conservation measures. Ballard EA 3-4 (emphasis added).  Thus, the situation at Ballard Locks was vastly different than the situation at Bonneville Dam.

89.     After Congress responded to this situation by enacting Section 120, the agency applied the new Section to address the situation at Ballard Locks. NMFS ultimately proposed a limited lethal take of sea lions through capture and euthanasia. Ballard EA, 89. However, NMFS stipulated that lethal removal *could not commence* until "the sea lion predation rate exceed[ed] *10 percent* of the steelhead passing on any consecutive 7-day period." *Id.* Then, after lethal removal was initiated, if the predation rate fell below 10 percent for any consecutive 14-day period, lethal removal had to cease. *Id.* NMFS estimated only 15 sea lions would be taken, and

required that, if at any point, 15 were lethally removed, the task force had to re-convene and evaluate the situation. Ballard EA 91.

90.    Prior to the current action at Bonneville Dam, the Ballard Locks situation was the only other time NMFS issued a Section 120 authorization.

**E.    NMFS's March 2008 Decision to Authorize to Killing Sea Lions at Bonneville Dam**

91.    In December 2006, the states of Oregon, Washington, and Idaho filed a formal application requesting authorization to kill sea lions at Bonneville Dam. *See* 72 Fed. Reg. 4239 (Jan. 30, 2007). Pursuant to Section 120, NMFS determined that the states' application contained sufficient information to warrant convening a Pinniped-Fishery Task Force ("the Task Force") to consider the application. *Id.* at 4239. NMFS then solicited comments on the states' application and nominations for possible Task Force members.

92.    The states' application proposed to lethally remove an unidentified number of California sea lions if the animals were observed above Columbia River Navigation Marker 85, or within approximately 6 miles downriver of Bonneville Dam. *See* Oregon Department of Fish and Wildlife, Washington Department of Fish and Wildlife, and Idaho Department of Fish and Game Request for MMPA Section 120 Pinniped Removal Authority, Nov. 2006 ("States' 2006 Section 120 Application") at 1. In addition to proposing the killing of any animal observed above Marker 85, the states also proposed that "all individually marked California sea lions that have been documented feeding on salmonids at Bonneville Dam" could be candidates for removal regardless of where they were actually found on the river. *Id.*

93.    On March 15, 2007, HSUS submitted extensive comments on the application.

94.    The 18-member Pinniped-Fishery Interaction Task Force convened on three occasions to review the state's applications: on September 4-5, 2007, October 9-10, 2007, and

October 30-31, 2007. Although the Task Force was unable to reach consensus on the application, it nevertheless issued a "majority" opinion recommending approval of the states' application.

95.     Although specifically asked by NMFS to provide advice on how to determine whether the sea lions are having a "significant negative impact" on salmonid decline, the Task Force was unable to agree on a quantitative standard. *Id.* at 10. Instead, the Task Force majority agreed on a number of vague factors to serve as "criteria," including whether pinniped presence at the Dam coincides with presence of ESA listed salmonids, whether predation has increased beyond historical levels, whether predation is likely to continue if "the impact remains unchecked," and whether salmonid mortality is "comparable to other forms of in-river mortality that is currently being managed." *Id.* at 10–11.

96.     The Marine Mammal Commission ("MMC"), an entity created by the MMPA to advise NMFS on scientific matters, submitted extensive comments on the Task Force's recommendations. MMC Nov. 23, 2007 Letter to Mr. Lohn, Regional Administrator of NMFS. Among its suggestions, the MMC recommended that: (1) NMFS "articulate a quantitative standard" for determining significance of sea lion predation on the decline or recovery of salmonid populations, and offering several quantitative standards as options; (2) if NMFS's standard for Bonneville Dam differs from the standard applied at Ballard Locks, NMFS should explain the disparity; (3) NMFS compare the level of salmonid predation to the level of take from other sources and "explain why some sources are considered significant while others are not;" (4) NMFS identify a predation level at which NMFS would no longer consider sea lion predation to be significant; and (5) NMFS reject any proposal to kill sea lions simply because they enter a geographic area, expressing concerns regarding whether that would comply with the MMPA's "individually identifiable" requirement. *Id.* at 1, 4.

97.     On January 18, 2008, NMFS published a Draft Environmental Assessment Considering the states of Oregon, Idaho, and Washington's Request for Lethal Removal Authority of California Sea Lions in Accordance with the Marine Mammal Protection Act. ("Draft EA"). 70 Fed. Reg. 3453 (Jan. 18, 2008).

98.     In the Draft EA, NMFS considered four alternatives: (1) a no action alternative, (2) continued non-lethal deterrence only, (3) lethal removal of up to 85 California sea lions, or the number of sea lions necessary to lower the observed predation rate to less than 1 percent after non-lethal removal (the Preferred Alternative), or (4) lethal removal of between 150 and 170 sea lions, or the number of sea lions necessary to lower the observed predation rate to less than 0.5 percent. Draft EA 2-6–16.

99.     On February 19, 2008, HSUS submitted extensive comments on the Draft EA.

100.    On March 18, 2008, NMFS issued its Final EA, a Finding of No Significant Impact ("FONSI") under NEPA, and identical Letters of Authorization to Washington, Oregon, and Idaho, granting the states authority to lethally take sea lions under Section 120. NMFS selected a modified Alternative 3.  Final EA P-1.

101.    Under the selected alternative, the Letters of Authorization allow the states to remove *each year* up to one percent of the Potential Biological Removal level ("PBR") set for California sea lions. Based on the current PBR level for California sea lions, the states may remove up to 85 sea lions this year. This number may vary if NMFS amends the PBR level for California sea lions. NMFS's Letters of Authorization authorize the states to either trap and euthanize sea lions or to shoot the animals while they are in the water. Final EA 4-7.

102.    In setting the criteria for determining whether sea lions are having a "significant negative impact on the decline or recovery" of listed salmonids, 16 U.S.C. § 1389(b)(1), NMFS

expressly rejected the MMC's recommendation to adopt a quantitative standard. While NMFS acknowledged that there were several options for quantifying "significance," including calculating "the extent to which pinniped predation increases extinction risk or delays the recovery of salmon," comparing NMFS's prior ESA consultations as guide, or considering whether predation slows recovery of salmon populations by more than 10 percent (a common method for determining significance under the MMPA), NMFS summarily rejected these or any quantitative proposals and instead adopted the Task Force's vague "criteria," as well as an ill-defined "totality of circumstances" approach. Final EA 2-4. This approach would allow a California sea lion to be killed under a number of scenarios, including if the sea lion: (1) is observed eating a *single salmon* in the area directly below Bonneville Dam, or (2) has been observed taking a single salmon and has been observed any 7 non-consecutive days in the 6 mile area between navigation marker 85 and the Bonneville dam. *Id.* at 11–12.

103.    Shortly after NMFS issued its March 2008 authorization to kill sea lions at the Bonneville Dam in 2008, Plaintiffs filed a lawsuit challenging NMFS's authorization. The District Court ruled in favor of NMFS, but in November 2010, the Court of Appeals for the Ninth Circuit reversed and ruled in favor of the plaintiffs.

104.    The Court of Appeals opinion highlighted two primary errors with NMFS's 2008 decision: (1) the agency failed to adequately explain its inconsistent factual findings that sea lion predation is having a significant negative impact on salmonid recovery, and that much greater takes by fisheries and hydropower operations are not significant; and (2) the agency failed to adequately explain its implicit determination that sea lion predation greater than 1 percent of the total run results in a significant negative impact on salmonid recovery, which must be assumed

from NMFS's choice to terminate lethal removal of sea lions if the 3-year predation rate average drops below 1 percent. *See* Decision Memo at 9.

105.    The Court of Appeals remanded to the District Court with instructions to vacate NMFS's Section 120 authorization, and to remand the matter to the agency. *Id.*

**F.    NMFS's May 2011 Decision to Authorize Killing Sea Lions at Bonneville Dam**

106.    On May 12, 2011, NMFS approved requests from the States of Washington and Oregon under Section 120 of the MMPA, authorizing the states to kill up to 85 California sea lions annually at the Bonneville Dam.  NMFS granted this authorization after again concluding that "individually identifiable" sea lions are having "a significant negative impact on the decline or recovery" of salmonid stocks. On May 13, 2011, NMFS publicly announced its decision and indicated that the authorization to kill sea lions would be effective immediately.

107.    NMFS did not publish any application from the states in the Federal Register, although the agency's Letters of Authorization indicate that the states again requested authority to kill sea lions under Section 120 of the MMPA on December 6, 2010, less than two weeks after the Court of Appeals for the Ninth Circuit vacated NMFS's prior authorization.  Thus, unlike the prior authorization, it is unclear what terms and conditions the states proposed to be authorized.

108.    NMFS also did not seek public comment on the states' new request, and it did not convene the Pinniped-Fishery Interaction Task Force.  The memo accompanying NMFS's May 2011 authorization concludes that "In light of the narrow remand and because we propose to authorize essentially the same lethal removal program as in 2008, Section 120's procedural requirements (such as application by the states, public comment on the application, and convening the Pinniped-Fishery Interaction Task Force) do not apply to the current action." NMFS Decision Memorandum at 12-13 (May 12, 2011). However, NMFS's decision documents

32

also make clear that the agency is acting hastily because it "is facing a significant constraint to issue a revised decision" due to a May 31, 2011 deadline to add individual sea lions to the list of those that can be killed. SIR at 28.

109.    It is clear, however, that this is a new request and a new authorization. Unlike the prior application, Idaho did not join Washington and Oregon in the December 2010 request, because Idaho has withdrawn from the program. Further, the new authorization is valid until June 2013, whereas the prior authorization was valid until June 2012. Washington LOA at 4. Moreover, the terms and conditions of the new authorization are different than the prior authorization. By example, the area in which sea lions seen taking salmonids may be added to list of animals targeted for removal has been expanded to include the fish ladders and areas above the Dam, and the appointment of an Institutional Animal Care and Use Committee by the states is now strictly required. *Id.* at 1. NMFS also eliminated the 1 percent predation rate threshold for suspension of lethal removal activities. SIR at 5.

110.    The Pinniped-Fishery Interaction Task Force did reconvene on October 25, 2010, but it did so for the purpose of evaluating the effectiveness of the prior authorization, which was then still in effect. The October 2011 Task Force Report indicates that it was acting pursuant to 16 U.S.C. § 1389(c)(5) of the MMPA  to "evaluate the effectiveness of the permitted intentional lethal taking or alternative actions implemented," and not pursuant to 16 U.S.C. § 1389(c)(1) under which the Task Force recommends to NMFS whether to approve or deny a proposal for intentional lethal taking of pinnipeds. 16 U.S.C. § 1389(c)(1).

111.    NMFS also issued a Supplemental Information Report on its 2008 Final EA concerning the impacts of the sea lion killing authorization. NMFS stated that it was not re-opening the Final EA. However, NMFS proceeded to describe new data and other information

not previously considered in the 2008 Final EA or during the prior authorization process. As to all of this data, NMFS concluded: "that the new information and circumstances are not significant" and "[a]dditional public review is therefore not warranted." SIR at 27–28.

112.    In particular, NMFS highlighted one category of new data at the beginning of the SIR which the agency claimed was irrelevant to its Section 120 authorization. NMFS recognized "new information" resulting from "a number of focal studies" indicating that predation by non-indigenous fish on juvenile salmonids "could equal or exceed impacts" from each of the four primary factors impacting salmonid recovery: hydrosystem development, fisheries harvest, hatchery practices, and habitat alteration. SIR at 12. These other impacts on salmonid recovery were discussed in NMFS's 2008 Final EA. Final EA at P-3, 3-15 – 3-33. Nevertheless, NMFS declined to review the potential environmental impacts of predation by non-indigenous fish on salmon recovery after concluding that this issue is "beyond the scope of actions to reduce mortality from sea lion predation . . . ." SIR at 16.

113.    NMFS also issued a consultation memorandum under the Endangered Species Act on May 10, 2011 ("ESA Consultation Memo"). NMFS most recently produced Biological Opinions related to sea lion predation at the Bonneville Dam in 2008 and 2009. *See* ESA Memo at 2. The purpose of the ESA Consultation Memo was to determine whether further consultation was required as a result of the new authorization. *Id.* at 1. NMFS concluded that while an increase in the number of Steller sea lions in the action area changed the environmental baseline for evaluating impacts to listed species within the action area, the conditions for re-initiating consultation had not been met, and the previous analyses of adverse effects on listed species (salmonid stocks and Steller sea lions) remains valid.

114.    In NMFS's May 2011 Decision Memorandum, as was the case with the agency's 2008 Section 120 authorization, NMFS equates the MMPA standard "significant negative impact on the decline or recovery" of salmonid stocks with a finding that sea lion predation is "measurable" and has "grown." Decision Memorandum at 14.

115.    This interpretation of Section 120's "significance" standard is virtually the same as the agency used in its 2008 decision.  Moreover, the "measurable" and "growing" standard simply amounts to a requirement that sea lions have *an impact*, not a *significant* impact.  Indeed, all that is required for a sea lion to be killed under NMFS's current (and prior) Section 120 authorization is that the sea lion is observed eating a *single salmon* in the area directly below or directly above the Bonneville Dam. *Id.* at 18.

116.    NMFS's Decision Memorandum seeks to explain the inconsistency in its factual findings that sea lion predation is having a significant negative impact on salmonid recovery, and that much greater takes by fisheries and hydropower operations are not significant, by asserting that pinniped predation is a new, unmanageable and increasing threat to salmonids, and fisheries and hydropower dams are a controlled and decreasing threat. Decision Memorandum at 19-34.

117.    However, NMFS's attempt to explain away the inconsistencies in its factual findings relating to different sources of threats to salmonids remains inadequate – the number of salmonids eaten by sea lions remains dramatically lower than the number of salmonids that the government permits fisheries and hydropower operations to take. Further, as described above, data now available since NMFS's 2008 decision indicates that sea lions are staying at the Dam fewer days each year, that their predation rate has dropped every year since the prior authorization and will do so again this year, and that the predation rate has remained low this year despite the fact that lethal removal was prohibited and only non-lethal techniques (e.g.,

hazing) could be used. Moreover, since NMFS's 2008 decision, the amount of take from fisheries and dams has not been decreasing, and fisheries have exceeded the established harvest limits in two of the last three years, despite near-record salmonid run sizes and mid-season efforts by fishery managers to control and limit take by fishermen. In sum, the available data indicates that that there can be no rational explanation for authorizing the killing of sea lions at Bonneville Dam.

118.    NMFS's Decision Memorandum also seeks to respond to the problems identified with its 1 percent predation rate threshold for suspension of lethal removal activities. The agency abandons its 1 percent predation rate in favor of a threshold for suspension that is based on a "detectable decline in the absolute number of salmonids killed." Decision Memorandum a 38. NMFS attempts to justify the decision to adopt a new "detectable decline" standard by claiming that such a test is more appropriate than a bright line test, that several years of removal activity would be required before the agency could confirm that the threshold has been met, and that states aren't allowed to kill more than 1 percent of PBR (currently 85 animals) so sea lion populations will not be at risk. *Id.*

119.    However, NMFS does not adequately define what constitutes a "detectable decline." Moreover, NMFS does not provide any rationale for use of actual take numbers, except to note that doing so will mean that this trigger for termination of the program will never be met during the life of the authorization. In addition, the separate requirement that the number of sea lions killed cannot exceed 1 percent PBR (which is related only to the health of sea lion stocks), is irrelevant to an analysis of what level of sea lion predation on salmonids would be too little to justify continuing the lethal removal program.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim 1: Violations of the Procedural Requirements of the MMPA and APA

120.    Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–119 above.

121.    By failing to undertake the procedures required for approval of Section 120 applications, NMFS has violated the MMPA and APA. Specifically, NMFS: (1) failed to require the States of Oregon and Washington to produce a new Section 120 application describing the changed circumstances, if any, warranting authorization of lethal removal of sea lions; (2) failed to provide public notice by publishing the December 2010 requests for authorization by the States of Oregon and Washington in the Federal Register, and failed to provide an opportunity for public comment on the requests; (3) failed to convene the Pinniped-Fishery Interaction Task Force to make recommendations on whether to approve or deny the requests for authorization of lethal removal of sea lions, the parameters of the taking to be allowed, and the criteria for evaluations the success of the action; and (4) addressed new data and information not previously considered without accepting public comment or convening the Pinniped-Fishery Interaction Task Force to address the new data relied upon. NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam is arbitrary and capricious, an abuse of discretion, and not in accordance with the MMPA, 16 U.S.C. § 1389, and must be set aside. 5 U.S.C. § 701-706.

### Claim 2: Violations of the Substantive Requirements of the MMPA and the APA

122.    Plaintiffs incorporate herein by reference all of the allegations contained in paragraphs 1–121 above.

123.    In authorizing the killing of up to 85 sea lions per year, NMFS has violated the MMPA and APA. Specifically, NMFS: (1) failed to adequately explain its inconsistent factual

findings that sea lion predation is having a "significant negative impact on the decline or recovery" of listed salmonids, and that much greater takes by fisheries and hydropower operations are insignificant; (2) failed to adequately explain its decision to require a "detectable decline" in actual salmon caught by sea lions before terminating the lethal removal program instead of the previous 1 percent predation rate threshold; and (3) ignored and/or misrepresented important data when considering the Section 120 request. 16 U.S.C. § 1389. NMFS's decision to authorize the lethal removal of sea lions at Bonneville Dam is arbitrary and capricious, an abuse of discretion, and not in accordance with the MMPA, 16 U.S.C. § 1389, and must be set aside. 5 U.S.C. § 701-706.

### Claim 3: Violations of NEPA and the APA

124.    Plaintiff incorporates herein by reference all of the allegations contained in paragraphs 1–123 above.

125.    By issuing an SIR instead of preparing a supplemental EA or an EIS, NMFS has violated NEPA and the APA. Specifically, NMFS failed to supplement its Final EA or issue an EIS to consider: (1) the environmental impacts of a newly recognized source of predation on salmonids, which NMFS believes may have a greater impact to salmon than the factors already known to be most profoundly delaying salmon recovery; (2) the environmental impacts to the growing ESA-listed Steller sea lion population at the Bonneville Dam; and (3) the environmental impacts of other new data relied upon in making its May 2011 decision, especially data on recent trends in run sizes, sea lion predation rates, sea lion residency times, and fisheries takes, which directly implicate the potential for success of the sea lion removal program and thus impacts to salmonids. Further, NMFS failed to provide prior public notice and opportunity to comment on the potential environmental impacts noted in the SIR. NMFS's decision to authorize the lethal

removal of sea lions at Bonneville Dam based on the SIR is arbitrary and capricious, an abuse of discretion, and not in accordance with NEPA, 42 U.S.C. § 4332; 40 C.F.R. 1502.9(c), and must be set aside. 5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an order:

1.      Declaring Defendants' decision to authorize the lethal removal of sea lions at Bonneville Dam to be unlawful under the Marine Mammal Protection Act, 16 U.S.C. §§ 1362, *et seq.*, the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.*, and "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law" under the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*;

2.      Enjoining Defendants' authorization of lethal removal of sea lions at Bonneville Dam, and vacating and remanding to NMFS the decision to authorize lethal removal;

3.      Awarding Plaintiffs their reasonable attorneys' fees and costs for this action; and

4.      Granting Plaintiffs such other and further relief as may be just and proper.


May 19, 2011                                                Respectfully Submitted,

                                                            _____
                                                            Ralph E. Henry
                                                            D.C. Bar No. 982586
                                                            rhenry@hsus.org
                                                            Jonathan R. Lovvorn
                                                            D.C. Bar No. 461163
                                                            jlovvorn@hsus.org
                                                            The Humane Society of the United States
                                                            2100 L Street, N.W.
                                                            Washington, DC 20037
                                                            (202) 452-1100 (phone)
                                                            (202) 676-2357 (facsimile)


                                                            *Attorneys for Plaintiffs*